**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JEFFREY GLAZER and STAND ALONE PRINTING & PUBLISHING, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )    No. 05 C 4501 ) |
| QUEBECOR WORLD, INC., JEAN LABELLE, and MARTIN CAYER, | ) ) ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

Before the court is defendants' motion to dismiss the first amended complaint.  For the following reasons, the motion is granted in part and denied in part.

**BACKGROUND**

This is an action arising out of print-brokerage contracts between plaintiffs Stand Alone Printing & Publishing, Inc. ("Stand Alone") and Jeffrey Glazer and defendant Quebecor World, Inc. ("Quebecor").[1]  Plaintiffs originally filed this action in the Circuit Court of Cook County, Illinois in February 2005.  In June

---

[1]  In the caption of the complaint, plaintiffs name "Quebecor World Montreal, a division of Quebecor World, Inc." as a defendant.  As this caption plainly implies, and as stated in defendants' Corporate Disclosure filing, Quebecor World Montreal is a division of Quebecor World, Inc. and not a separate suable legal entity.  Quebecor World, Inc. is therefore the proper defendant. We have changed the caption of the case to so reflect, and plaintiffs are directed to file an amendment to the complaint substituting Quebecor World, Inc., for Quebecor World Montreal as the corporate defendant.

2005, the case was dismissed for want of prosecution but reinstated shortly thereafter. On June 24, 2005, plaintiffs filed a First Amended Verified Complaint (the "complaint"). Defendants Quebecor, Martin Cayer, and Jean Labelle were served with summons on, respectively, July 7, 8, and 19, 2005. On August 5, 2005, defendants removed the action to this court, asserting federal diversity jurisdiction pursuant to 28 U.S.C. § 1332. The complaint alleges the following facts, which are taken as true for purposes of the instant motion.

There is a custom in the print trade whereby brokers arrange printing contracts between printing companies and publishers, and in return receive a commission, typically a percentage of the monies paid by the publisher to the printer. Plaintiff Glazer is a broker of printing contracts for various kinds of printing jobs such as monthly periodicals. Glazer is an officer and shareholder of plaintiff Stand Alone, an Illinois corporation.[2]

Defendant Quebecor is a Canadian corporation that is engaged in the printing business. From time to time, Quebecor engages the services of print brokers to obtain printing contracts with publishers. Defendants Jean Labelle and Martin Cayer are both employed by Quebecor as regional vice presidents.

---

[2] "For a period of time, prior to 2002, Glazer conducted his business using the trade name, Stand Alone Printing & Publishing. Thereafter, Glazer caused Stand Alone to be incorporated in the State of Illinois . . . ." (First Amended Complaint ¶ 2.)

There are three alleged brokerage agreements between either Glazer or Stand Alone and Quebecor at issue in this litigation; we will refer to them as the "General Media Agreement," the "LFP Agreement," and the "Knight Agreement."

**The General Media Agreement**

Around June 2001, Glazer (along with an individual named John Stanford who worked with Glazer and is not a party to this action) became aware that General Media International, Inc. ("General Media"), a publisher of periodical magazines, was "seeking a new printing contract." (First Amended Complaint ¶ 8.) Glazer had established business relationships with both General Media and Quebecor, so he brokered a contract between those parties pursuant to which Quebecor agreed to print certain of General Media's magazines. According to the complaint, but for Glazer's "efforts and actions," "Quebecor would not have received the printing contract from General Media." (Id. ¶ 10.)

On June 26, 2001, Glazer (and Stanford) entered into a written vendor/broker agreement with Quebecor (the "General Media Agreement") pursuant to which Quebecor would pay a six percent commission to Glazer on the invoices for Quebecor's printing of General Media's magazines, less freight and distribution. (The approximate value of the contract to Glazer was about $20,000 per month in commissions.) In early October 2001, Quebecor entered into its printing contract with General Media. "As an integral

part of that contract, Glazer was obligated to, and did, pay [$50,000] to General Media to secure the agreement for brokerage and commission fees." (Id. ¶ 13.)

From June 2001 until October 2004, Quebecor printed General Media's magazines and paid Glazer commissions. At some point in 2003, General Media filed for bankruptcy protection pursuant to Chapter 11 of the United States Bankruptcy Code. (The proceeding was still pending at the time plaintiffs filed the first amended complaint.) In August 2004, the bankruptcy court allowed the rejection of the printing contract between General Media and Quebecor.

Either prior to or during the pendency of the General Media bankruptcy, General Media had ceased paying Quebecor for Quebecor's printing services. Subsequently, with the consent and approval of the bankruptcy court, General Media paid Quebecor approximately $1.4 million in connection with ongoing printing services. Glazer contends that he is entitled to a commission of six percent on that payment ($84,000).

In addition, Glazer negotiated with Quebecor in an effort to reduce the printing fees it was charging General Media, and he agreed to a lower commission as well. "Glazer supplied his knowledge of the business and utilized available information that was of great benefit to both Quebecor and General Media regarding lower printing costs premised upon the assurance that Glazer would

retain his commission agreement, albeit somewhat lower." (Id. ¶ 18.)

Although the bankruptcy court allowed the rejection of the contract between General Media and Quebecor, Quebecor still continued to print General Media's magazines.[3] Notwithstanding the continuation of this relationship, Quebecor made its last payment of commissions to Glazer in October 2004. In November 2004, Quebecor sent Glazer a letter informing him that the bankruptcy court had approved General Media's plan of reorganization and the rejection of the contract between General Media and Quebecor. As a result, Quebecor stated, it was terminating its agreement with Glazer, effective immediately. Since late 2004, Quebecor printed certain of General Media's magazines, but it is alleged on information and belief that Quebecor does not currently do so. Glazer demanded payment of his commissions in relation to magazines that were printed in late 2004 and early 2005, but Quebecor did not pay the commissions.

**The LFP Agreement**

On April 16, 2002, plaintiff Stand Alone (Glazer's company) entered into a printing brokerage agreement with Quebecor (the "LFP Agreement") regarding Quebecor's printing of magazines published by LFP Publications ("LFP"). Pursuant to that agreement, Stand Alone would receive a five percent commission for Quebecor's printing of

---

[3]/ General Media is identified in those magazines as the publisher.

seven LFP magazines. The term of the LFP Agreement was thirty-six months, but Quebecor agreed to renew the agreement in the event that it continued printing the LFP magazines beyond that term.

On May 3, 2005, Quebecor sent a letter to Stand Alone, stating that pursuant to the terms of the LFP Agreement, that agreement had expired at the end of March 2005. Stand Alone contacted Quebecor and "remind[ed]" it "of the agreement to extend or otherwise renew the commission agreement," but Quebecor failed to pay Stand Alone any additional commissions for the printing of the LFP magazines. (<u>Id.</u> ¶ 26.)

**The Knight Agreement**

On May 7, 2002, Stand Alone entered into another printing brokerage agreement with Quebecor (the "Knight Agreement") pertaining to Quebecor's printing of magazines published by Knight Publishing ("Knight"). Pursuant to that agreement, Stand Alone would receive a five percent commission for Quebecor's printing of eight Knight magazines. The Knight Agreement was for the printing of the "May and June cycles," but Quebecor agreed to renew the agreement in the event that it continued printing the Knight magazines beyond those cycles.

On May 5, 2005, Quebecor notified Stand Alone in a letter that the Knight Agreement had "expired as of the end of April 2005." (Complaint, Ex. H.) Although Stand Alone protested to Quebecor,

Quebecor failed to pay Stand Alone any additional commissions for the printing of the Knight magazines.

**This Action**

The complaint asserts three breach of contract claims against Quebecor: Glazer's claim for breach of the General Media Agreement (Count I); Stand Alone's claim for breach of the LFP Agreement (Count II); and Stand Alone's claim for breach of the Knight Agreement (Count III). Stand Alone also brings an unjust enrichment claim against Quebecor (Count IV). Both plaintiffs bring a fraud claim against Labelle (Count V), and Stand Alone brings a fraud claim against Cayer (Count VI). Count VII is a claim by Stand Alone against Labelle and Cayer for civil conspiracy. Plaintiffs seek compensatory and punitive damages.

Defendants now move to dismiss the complaint for lack of personal jurisdiction over Labelle and Cayer, improper venue, <u>forum non conveniens</u>, and for failure to state certain claims.

<b>DISCUSSION</b>

**A.  Personal Jurisdiction**

Defendants Labelle and Cayer, who are Canadian residents, contend that the claims asserted against them (Counts V, VI, and VII) should be dismissed because the "fiduciary shield" doctrine prevents our exercise of personal jurisdiction over them. This doctrine, recognized by the Illinois courts, gives us discretion to decline to exercise personal jurisdiction over an individual whose

presence and activity in the forum state were solely on behalf of his employer. See Rice v. Nova Biomedical Corp., 38 F.3d 909, 912-14 (7th Cir. 1994) (citing Rollins v. Ellwood, 565 N.E.2d 1302, 1313-18 (Ill. 1990)). The fiduciary shield doctrine is not available if the employee was also (or instead) acting to serve his own personal interests, which need not be strictly pecuniary. See Rice, 38 F.3d at 912.

The complaint alleges very few facts regarding Labelle and Cayer. It is alleged that each "from time to time[] acted on behalf of Quebecor in negotiating and executing contracts and other agreements with Glazer and Stand Alone." (First Amended Complaint ¶¶ 5, 6.) Labelle is alleged to have been Stand Alone's contact at Quebecor who "failed and refused to continue making the payments as required by the terms of the LFP Agreement." (Id. ¶ 26.) Likewise, Cayer is alleged to have "failed and refused to continue making the payments as required by the terms of the Knight Agreement." (Id. ¶ 30.) In addition, there are vague allegations within Counts V-VII that Labelle and Cayer made false statements in order to induce plaintiffs to enter into the agreements.

Labelle and Cayer have submitted declarations stating that each is one of over one hundred regional vice-presidents at Quebecor, and neither is a corporate officer. Labelle states that he was involved in negotiating all three of the brokerage agreements at issue on behalf of Quebecor and that he signed the

LFP Agreement on Quebecor's behalf as one of its vice-presidents. Labelle states that all of his contacts with plaintiffs and with the state of Illinois were solely on behalf of Quebecor. Cayer's involvement with plaintiffs and the state of Illinois was more limited: he states that he did not negotiate the terms of any of the three agreements, either in person or by telephone, and that he merely signed the Knight Agreement on behalf of Quebecor and sent it to Stand Alone for a signature. Both Labelle and Cayer are salaried employees of Quebecor, and their salaries are not contingent on Quebecor's sales or profits. They are eligible for bonuses that are contingent on the performance of the company and their respective divisions.

Plaintiffs offer this brief argument against application of the fiduciary shield: "The Defendants . . . receive financial reward and bonuses if Quebecor's profit margin is increased. Thus, even though Labelle and Cayer's actions were for the benefit of their employer, their primary motivation was personal gain directly related to the company's short-term health, ignoring the potential long-term consequences of breaching multiple contracts, thus setting aside the fiduciary shield. Moreover, as Vice Presidents of Quebecor, Labelle and Cayer had control over their own actions-- actions that had a tortious result, in damage caused to Plaintiffs, in Illinois." (Plaintiffs' Response at 9-10.)

Plaintiffs' arguments are unavailing. The fact that Labelle and Cayer receive bonuses based on the performance of their division and/or of the company does not constitute a "personal interest" for purposes of the fiduciary shield doctrine. As the Illinois Supreme Court remarked in <u>Rollins</u>,

> we are not persuaded by the argument, raised by various sources, that asserting personal jurisdiction over an employee who acted in the scope of his employment is justified because the employee is serving his own financial interests when he performs the tasks imposed upon him by his employer. In practical terms, an employee . . . has little or no alternative besides unemployment when ordered to enter another State to carry out the wishes of his employer.

565 N.E.2d at 1318. Which brings us to plaintiffs' next contention--that Labelle and Cayer by virtue of their roles as vice-presidents had "control over their own actions" and thus the fiduciary shield should not apply. Although district court opinions are mixed on the significance of an employee's discretion in performance of job duties, the Seventh Circuit stated in <u>Rice</u> that if the defendant acts solely on behalf of his employer, "he is under the fiduciary shield and this regardless of whether he exercised discretion rather than merely carrying out precise orders mechanically." 38 F.3d at 912. In any event, plaintiffs fail to support their conclusory assertion regarding "control" with any evidence (it does not automatically follow merely from Labelle and Cayer's titles that they had discretion), and indeed fail to even allege in the complaint that Labelle and Cayer had any sort of

discretion concerning the performance of their job and their ensuing contacts with the state of Illinois.

Plaintiffs have failed to demonstrate that the fiduciary shield doctrine does not apply. Accordingly, in our discretion, we decline to exercise jurisdiction over defendants Jean Labelle and Martin Cayer, and Counts V, VI, and VII will be dismissed for lack of personal jurisdiction over those defendants. In view of this ruling, we need not address defendants' Rule 12(b)(6) argument for dismissal of Count VII or their Rule 9(b) argument for dismissal of Counts V, VI, and VII.

## B.     Venue

We are left with Glazer and Stand Alone's claims against Quebecor for breach of contract and unjust enrichment in Counts I-IV. Defendants argue that Glazer's claim in Count I for breach of the General Media Agreement and Stand Alone's unjust enrichment claim in Count IV, to the extent it relates to commissions on the General Media magazines, should be dismissed due to a forum-selection clause in the General Media Agreement that selects Quebec.[4]

Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(3) where a claim is covered by a valid forum selection clause

---

[4]/    The General Media Agreement provides: "The above terms and conditions and all other express terms of this Agreement shall be governed and construed in accordance with the laws of the province of Quebec unless otherwise specified in writing and each party hereby irrevocably and non-conditionally agrees to subject any claims or lawsuits arising out of this Agreement to the jurisdiction of the Court of such province."  (First Amended Complaint, Ex. A, at 5.)

that selects a venue elsewhere.  See Continental Cas. Co. v.
American Nat. Ins. Co., 417 F.3d 727, 733 (7th Cir. 2005).   A
forum selection clause is presumptively valid and enforceable
unless "(1) its incorporation into the contract was the result of
fraud, undue influence, or overweening bargaining power; (2) the
selected forum is so gravely difficult and inconvenient that the
complaining party will for all practical purposes be deprived of
its day in court; or (3) its enforcement would contravene a strong
public policy of the forum in which the suit is brought, declared
by statute or judicial decision."  AAR Int'l, Inc. v. Nimelias
Enters. S.A., 250 F.3d 510, 525 (7th Cir. 2001) (internal quotation
omitted).

        Plaintiffs' first argument against application of the clause
does not really fit within any of these three categories.
Plaintiffs maintain that it would be "unreasonable" to enforce the
forum selection clause because there are two other contracts at
issue in this action that do not contain forum-selection clauses.
In support of this argument, plaintiffs cite Pegasus
Transportation, Inc. v. Lynden Air Freight, Inc., 152 F.R.D. 574
(N.D. Ill. 1993), which was a suit for unpaid tariff fees for 414
shipments of goods.  A forum-selection clause that selected state
court was contained in the tariff relating to nearly half of the
shipments.  Defendant had removed the action to federal court, and
plaintiffs moved for remand to state court, arguing that because of

the forum-selection provision, the court should decline to exercise jurisdiction over the portion of the claim relating to those shipments.  The court rejected plaintiff's argument, stating that "enforcement of the forum selection clause by remanding less than half of [plaintiff's] identical claims to the state court would be unreasonable."  152 F.R.D. at 577.

Pegasus is distinguishable because it involved hundreds of shipments governed by a single tariff; the court refused to enforce the forum-selection clause that governed nearly half of the shipments because, in its view, it made little sense to treat the shipments differently when a single tariff governed them all.  The instant case, however, involves three entirely separate agreements, one of which contains a forum selection clause.  Plaintiffs fail to explain why it would be "unreasonable" to enforce a forum-selection clause with respect to one agreement (the General Media Agreement) simply because two entirely separate agreements (the LFP and Knight Agreements) that plaintiffs have chosen to include in the action do not contain such a provision.  In our view, it would be unreasonable to allow plaintiffs to avoid the application of the forum selection clause in the General Media Agreement simply because they have included in their suit claims based on two other contracts that do not contain such a clause.

Plaintiffs also contend (curiously, considering they are suing on the General Media Agreement) that "the General Media agreement,

or at least the forum selection clause, is void as a result of unfair bargaining power and coercion." (Plaintiffs' Response at 11.) They argue that the contract was a "take it or leave it" situation for Glazer in that he "felt that he had no other option than to sign the contract. [He] believed that if he did not sign the contract, or if he merely raised questions about any portion of the contract, such as the forum selection clause, Quebecor would contract with General Media without a brokerage contract, thus depriving Glazer of his commission." (Id. at 12.) Glazer states in his affidavit that Quebecor drafted the agreement, that he felt "pressured" to sign it, "only had time to briefly glance at" it, and "did not see the forum selection clause." (Glazer Affidavit ¶ 6.)

Even assuming that these allegations are true, we are unpersuaded. Plaintiffs fail to cite any cases for the proposition that such circumstances constitute undue influence or unfair bargaining power. Glazer is a business person, and there is no evidence that he is unsophisticated in negotiation or business practice. While he alleges that he perceived that Quebecor had greater bargaining power than he did, he fails to allege any facts indicating that this power was somehow unfair. Furthermore, that Glazer did not read the contract carefully and "did not notice" the forum selection clause is not a basis to deny enforcement of the clause. "[A] party to a contract has an obligation to read its

provisions. It is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them." <u>Bonny v. Society of Lloyd's</u>, 3 F.3d 156, 160 n.10 (7th Cir. 1993).

Plaintiffs have not met their burden of proving that application of the forum-selection clause would be unreasonable. Therefore, Count I of the complaint will be dismissed pursuant to Rule 12(b)(3). Count IV of the complaint, which alleges unjust enrichment in relation to all three contracts, also will be dismissed to the extent that it is based on the General Media Agreement because the claim "aris[es] out of" the General Media Agreement and is thus covered by the forum-selection clause as well.

## C. <u>Forum Non Conveniens</u>

Defendants contend that we should dismiss the remaining counts of the complaint—Counts II and III and part of Count IV—pursuant to the <u>forum</u> <u>non</u> <u>conveniens</u> doctrine. According to defendants, the claims we are dismissing can be brought in Quebec, and in the interest of judicial efficiency, plaintiffs' remaining claims should be dismissed so that all the claims can be tried in Quebec.

"The principle of <u>forum</u> <u>non</u> <u>conveniens</u> comes down to this: a trial court may dismiss a suit over which it would normally have jurisdiction if it best serves the convenience of the parties and the ends of justice. When an alternative forum has jurisdiction to

hear a case, and when a trial in the chosen forum would result in vexation and oppression to the defendant which would far outweigh the plaintiff's convenience or when the chosen forum would generate administrative and legal entanglements for the trial court, the court may dismiss the case." Kamel v. Hill-Rom Co., 108 F.3d 799, 802 (7th Cir. 1997) (citation omitted). The first step in a forum non conveniens inquiry is determining whether an adequate alternative forum is available to hear the case; if such a forum exists, then the court must balance the relevant private and public interest factors. Id. at 802-03.

The parties give short shrift to the question of Quebec as an adequate alternative forum; instead, they plunge directly into the private interest factors, especially the location of witnesses and evidence needed for trial. The problem with defendants' argument is that they do not really contend that a trial in the Northern District of Illinois would result in vexation and oppression that would far outweigh the convenience of plaintiffs. Their argument amounts to nothing more than assertions that it would be more convenient for them to litigate everything in Quebec (ignoring plaintiffs' convenience) and that it would be more orderly to have the claims in one suit than in two. These contentions may be true, but they do not merit application of the doctrine of forum non conveniens, which is applied only in "exceptional circumstances." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 504 (1947). Additionally,

defendants fail to cite any case law whatsoever supporting their contention that under the facts, we should apply the doctrine.

Defendants' motion to dismiss will be denied as to Counts II and III and as to Count IV, to the extent that it is based on the LFP and Knight Agreements.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the first amended complaint is granted in part and denied in part. Counts V, VI, and VII are dismissed for lack of personal jurisdiction over Jean Labelle and Martin Cayer. Count I as well as Count IV, to the extent that it is based on the General Media Agreement, are dismissed pursuant to Rule 12(b)(3). The motion is denied as to Counts II and III and as to Count IV, to the extent that it is based on the LFP and Knight Agreements.

Plaintiffs are directed to file an amendment to the first amended complaint by February 24, 2006, substituting Quebecor World, Inc. for Quebecor World Montreal as the proper corporate defendant. (Plaintiffs need not file an entirely new "second amended complaint"; a brief amendment to the existing complaint will suffice.)

DATE:       February 13, 2006

ENTER:
_____

John F. Grady, United States District Judge